**UNITED STATES of America,**

v.

Omar Ahmad Ali Abdel RAHMAN, a/k/a "Omar Amed Ali," a/k/a "Omar Abdel Al–Rahman," a/k/a "Sheik Rahman," a/k/a "The Sheik," a/k/a "Sheik Omar," El Sayyid Nosair, a/k/a "Abu Abdallah," a/k/a "El Sayyid Abdul Azziz," a/k/a "Victor Noel Jafry," Ibrahim A. El–Gabrowny, Siddig Ibrahim Siddig Ali, Clement Rodney Hampton–El, a/k/a "Abdul Rashid Abdullah," a/k/a "Doctor Rashid," Mohammed Abouhalima, Abdo Mohammed Haggag, Amir Abdelgani, a/k/a "Abdou Zaid," Fares Khallafalla, a/k/a "Abdou Fares," Tarig Elhassan, Fadil Abdelgani, Mohammed Saleh, a/k/a "Mohammed Ali," Victor Alvarez, a/k/a "Mohammed," Matarawy Mohammed Said Saleh, a/k/a "Wahid," Earl Gant, a/k/a "Abd Rashid," a/k/a "Abd Jalil," a/k/a "Abdur Rasheed," Defendants.

No. S3 93 Cr. 181 (MBM).

United States District Court,
S.D. New York.

Aug. 25, 1994.

Patrick J. Fitzgerald, Robert S. Khuzami, Andrew C. McCarthy, Alexandra Rebay, Asst. U.S. Attys., New York City, for U.S.

Wesley M. Serra, Brown, Berne & Serra, New York City, for defendant Alvarez.

Steven M. Bernstein, New York City, for defendant Amir Abdelgani.

William M. Kunstler, Ronald L. Kuby, New York City, for defendant El–Gabrowny.

Howard Leader, New York City, for defendant Siddig–Ali.

## OPINION AND ORDER

MUKASEY, District Judge.

The government, as it was required to do by *United States v. Levy*, 25 F.3d 146, 152 (2d Cir.1994) and its precursors, *see United States v. Iorizzo*, 786 F.2d 52, 59 (2d Cir. 1986), has moved to disqualify William M. Kunstler and Ronald L. Kuby and their firm,

Kunstler & Kuby (collectively, "the Kunstler firm" or "the firm"), from representing at trial their remaining client in this case, defendant Ibrahim A. El–Gabrowny, and from resuming their representation of defendant Siddig Ibrahim Siddig Ali. As set forth below, there are two insuperable obstacles to the Kunstler firm's continued representation of El–Gabrowny or its renewed representation of Siddig Ali that arise from the firm's relationships with defendants and potential witnesses in this case and from the conduct and statements of Kunstler and Kuby: (i) the tangle of conflicting interests that beset the Kunstler firm, because of both past multiple representation of clients and the Kunstler firm's own conduct, that could hamper effective representation of El–Gabrowny and Siddig Ali, and (ii) the substantial possibility that conduct by the Kunstler firm will be the subject of relevant proof at trial, with the result that both Kunstler and Kuby would be cast as unsworn witnesses if they were to take an active role in the courtroom at trial. Therefore, the motion is granted.

## I.

The immediate occasion for this motion, although by no means the only reason for it, was the stated decision in June by Siddig Ali to cease being represented by the Kunstler firm, obtain other counsel, and cooperate with the government. In his initial contact with the government preceding this stated decision, and throughout his later proffer sessions with the government, Siddig Ali was represented by Howard Leader, an attorney he had selected and contacted on his own and who is a member of this Court's panel of assigned counsel. (6/21/94 Tr. 6–7) In Siddig Ali's presence, and with his concurrence, Leader was appointed to represent him. (*Id.* at 13)

Although the government has not said so explicitly, it has at least implied that Siddig Ali's proffer agreement with the government, reached at the time he disclosed to the court his decision to cooperate, provides, as such agreements routinely do, that although disclosures during proffer sessions may not be used against him on the government's direct case even absent a final cooperation agreement, they may be used against him if, absent such a final agreement, he testifies at trial in a manner inconsistent with those disclosures. (*See* 8/17/94 Gov't Ltr. at 3 (arguing that if Siddig Ali contradicts statements to the government "he will be vigorously cross-examined regarding them".))

After several weeks of Siddig Ali's proffers, and after the disqualification motion was fully submitted, the government on August 12 notified the court and all defense counsel that it would not conclude any cooperation agreement with Siddig Ali but that it nonetheless would press its motion to disqualify the Kunstler firm. On August 15, Siddig Ali and Leader appeared in court with government counsel. Leader disclosed that he had been present "at every single debriefing that has occurred between my client and the government." (8/15/94 Tr. 4) He also confirmed that Siddig Ali would not plead guilty and cooperate but rather would go to trial. (*Id.*) Leader asked to be relieved from further representation of Siddig Ali because:

> I would feel ... in a great deal of difficulty to make out defenses, follow lines of cross-examination, and ultimately make arguments to a jury—
>
> THE COURT: If they conflicted with the representations by your client that you had heard previously?
>
> MR. LEADER: Precisely, Your Honor.

(*Id.*)

During the same conference, Leader stated that Siddig Ali wished to resume being represented by the Kunstler firm and to return to general population at the Metropolitan Correctional Center ("MCC") along with the other defendants in the case. (*Id.* at 5, 7–8) I told Leader and Siddig Ali that because resumed representation by the firm might be problematic, they should try to secure alternative counsel. (*Id.* at 5, 9)

On August 16, the day after the conference discussed above, I received two letters from the Kunstler firm. One stated that Siddig Ali had called the firm from the MCC and said "that the statements he had made to the government [otherwise unspecified] were false, and that he informed the government

that these statements were false." (8/16/94 ltr. (2 pages) at 1) The second informed me that Siddig Ali had requested a visit from either Kunstler or Kuby and invited me to "so order" the letter itself so as to facilitate their entry into the MCC. (8/16/94 ltr. (1 page)) By letter dated August 17, 1994, Leader informed me that Siddig Ali did not wish to meet with either Kunstler or Kuby.

On August 18, the parties appeared in court, with Siddig Ali represented by Leader, who stated that after further consultation, Siddig Ali did not wish to be represented by the Kunstler firm. Despite that, Kunstler and Kuby repeatedly sought an order directing that they be allowed to meet with Siddig Ali, apparently to debrief him about his disclosures to the government. That request was denied. (8/18/94 Tr. 16–20)

The August 18 conference addressed also whether the Kunstler firm may continue to represent El–Gabrowny. When the court raised the question of whether it might be necessary to secure from El–Gabrowny a waiver of the Kunstler firm's possible conflicts of interest in addition to the one secured at the time the firm began to represent Siddig Ali (*see infra* p. 269 n. 1), Kunstler immediately took the position that the prior waiver would suffice. (8/18/94 Tr. 4) Kuby added that El–Gabrowny was "willing to issue the same type of waiver that he issued before." (*Id.* at 269) Counsel informed the court that El–Gabrowny had seen all the government's submissions on the subject of possible conflicts other than the government's August 17, letter, which counsel then reviewed with El–Gabrowny. However, it later became apparent that the Kunstler firm had not reviewed with El–Gabrowny the government's submissions on the subject of conflict of interest, and it was agreed that El–Gabrowny would review that material with Anthony Ricco, Esq., whom El–Gabrowny selected to replace Kunstler and Kuby if they were disqualified as his counsel. (8/18/94 Tr. 10–13)

On the morning of August 23, Ricco notified the court that he had reviewed all the government's submissions with El–Gabrowny, and that the defendant "has decided to execute a waiver of any conflict of interest pertaining to the continued representation by Mr. Kunstler or Mr. Kuby," with one proviso:

> However, the defendant has expressed concern over unanticipated and unforeseen testimony and other evidence which may burgeon as the trial progresses. Accordingly, Mr. El–Gabrowny requests that the court appoint standby counsel, pursuant to the court's November 9, 1993 [opinion], to ensure that his Sixth Amendment right[s] to confrontation and cross-examination are not impaired by his decision to continue with Mr. Kunstler and Mr. Kuby as counsel.

(8/23/94 Ricco Ltr. at 1–2)

That afternoon, the parties appeared in court and I solicited from El–Gabrowny his understanding of the conflict issues and his decision as to whether to waive them. The following exchange ensued:

> THE COURT: Can you give me a brief summary of what your awareness is, what your understanding is of the conflict problem?
>
> THE DEFENDANT: (In English) I do understand that because previous relationship through my lawyers and former clients my lawyers won't be able fully to defend me.
>
> THE COURT: May not be able.
>
> THE DEFENDANT: (In English) May not be able to fully defend me. They are not going to be able to cross-examine a former client.
>
> THE COURT: Or make arguments that could hurt a former client.
>
> THE DEFENDANT: (In English) I understand that might be actual or potential conflict of interest, might show up during the trial.
>
> THE COURT: Okay. And the question is do you want to go ahead and be represented by them or not?
>
> THE DEFENDANT: (In English) Yes.

(8/23/94 Tr. 3–4) During that appearance, Kuby, Kunstler and El–Gabrowny all echoed the desire expressed in Ricco's letter for appointment of standby counsel (8/23/94 Tr. 4, 7–9), which they repeatedly presented, incorrectly, as the court's own proposal for

overcoming current conflicts. Indeed, Kuby went so far as to suggest that I had anticipated the current dispute over conflicts of interest when I mentioned appointment of standby counsel in a November 9, 1993 opinion.[1]

That procedural history was preceded by a far longer record of the Kunstler firm's relationships and activities, as set forth below.

## II.

### A. *The Firm's Prior Representation of Defendants and Others*

The Kunstler firm has a professional relationship dating back at least to 1990 with people who since have become defendants in this case. In 1990 and 1991, Kunstler, along with others, represented El-Sayyid Nosair at his New York State trial on charges arising from the November 5, 1990 murder of Rabbi Meir Kahane. That trial ended with Nosair's acquittal of murder and some assault charges, and his conviction on other assault and weapons charges. The Kunstler firm has represented Nosair in connection with the appeal of that conviction, although Nosair is represented in this case by court-appointed counsel. The Kahane murder is charged as an overt act in Count One and separately as murder in aid of racketeering in Count Five of the indictment. Charges related to the Kahane murder are set forth in Counts Six, Eight, Nine, and Ten.

El-Gabrowny is Nosair's cousin, and the Kunstler firm earlier informed the court that El-Gabrowny was instrumental in organizing the Muslim community in support of Nosair during the state court trial. (*See* 4/1/93 Tr. 7) El-Gabrowny was arrested and initially indicted in March 1993 for crimes growing out of an altercation between El-Gabrowny and a law enforcement officer who was seeking to execute a search warrant at El-Gabrowny's house in connection with the investigation into the bombing of the World Trade Center. He was represented from the outset by the Kunstler firm.

At the time of his arrest, El-Gabrowny was found in possession of allegedly forged Nicaraguan passports bearing the photographs of Nosair and his family and expiration dates well before Nosair's scheduled release from prison. The government has argued that securing Nosair's early release from prison was a motive and goal of the seditious conspiracy charged in the indictment. (5/4/94 Gov't Mem. at 28, 34) In addition, the government has alleged that it will prove El-Gabrowny administered a fund raised for Nosair's defense, from which some fees were paid to the Kunstler firm and which was used also to finance some of the unlawful conduct charged in the indictment. The government has stated as well that Siddig Ali's proffers during the period he was discussing cooperation included statements which, if repeated in court, would incriminate El-Gabrowny, both directly and indirectly. (7/28/94 Gov't Mem. at 21, 23, 25)[2]

The government has disclosed also that in March 1993 the FBI sought to question Abdo Mohammed Haggag, later indicted in this case. The government has stated that Hag-

---

**1.** That opinion was written on the last occasion I had to consider problems posed by the Kunstler firm's multiple representation in this case. The text counsel and their client apparently referred to, which has nothing to do with conflict of interest but deals only with preserving the attorney client privilege, reads as follows:

The government has suggested further that standby counsel be appointed to conduct cross-examination of any former client of the Kunstler firm who takes the stand at trial, so as to minimize the risk that that client's privileged communications to the Kunstler firm will influence the cross-examination. That will be done.

*United States v. Rahman,* 837 F.Supp. 64, 71 (S.D.N.Y.1993).

**2.** A portion of the government's submission relating to Siddig Ali's statements inculpating other defendants has been received *ex parte* and under seal. (7/29/94 McCarthy Aff. (received *ex parte* and sealed) ¶¶ 4–10) Although *ex parte* submissions may be resorted to when necessary to protect, among other things, against disclosure of information relating to ongoing investigations and information that could harm the national interest, *see In re John Doe Corp.,* 675 F.2d 482, 489–90 (2d Cir.1982), and although the information in the government's submission fits those categories, it has not been used to decide this motion. The portion that deals with statements that potentially inculpate other defendants relate in part to subjects already disclosed. To the extent the *ex parte* submission goes beyond those subjects, it is not necessary to decide this motion.

gag, who since has apparently agreed to cooperate with prosecutors, then consulted Omar Ahmad Ali Abdel Rahman, a Muslim cleric and alleged to be the leader of the seditious conspiracy charged in this case, who told the Kunstler firm through Ahmed Abdel Sattar to contact Haggag. Kuby then allegedly called the FBI, stated that the firm was representing Haggag, and directed that the FBI not contact Haggag further. (7/5/94 McCarthy Aff. ¶ 2(c)) The government has proffered also that at or about the same time the FBI interviewed Sattar, who has since been designated by Rahman as a paralegal to assist in his defense. The FBI received a letter from Kuby dated March 30, 1993, stating that Sattar did not wish to have further contact with the FBI and expressing the "grave concerns" of Kuby and unnamed others over FBI " 'attempts to recruit informers.' " (7/5/94 McCarthy Aff. ¶ 3)

In June 1993, when the Siddig Ali and others were arrested on charges that led to the first superseding indictment in this case, the Kunstler firm represented Siddig Ali from the time of his arrest until Siddig Ali retained Leader in June 1994. This joint representation was permitted only after both Siddig Ali and El–Gabrowny waived any possible conflict in a hearing pursuant to *United States v. Curcio,* 680 F.2d 881 and 694 F.2d 14 (2d Cir.1982). Before those waivers were secured, however, I suggested that both defendants consult independent counsel, appointed under the Criminal Justice Act ("CJA") with respect to possible conflicts of interest.

Kunstler objected, stating immediately in open court, without consulting either defendant, that '[t]hey are perfectly willing to be represented here by me and they are here and they are willing to waive any alleged conflict of interest.' (7/15/93 Tr. 17) He added that he did not want any CJA attorney 'talking to either one of them.' When I noted that neither defendant would be obligated to talk to independent counsel, but only to listen to an explanation of the risks of dual representation, Kunstler responded, 'There are no risks here, Judge, except those created by the government.' (*Id.* at 18)

*Rahman,* 837 F.Supp. at 66.

In August 1993, when another superseding indictment was returned adding Rahman and Nosair as defendants, Rahman was represented initially by retained counsel who informed the court by letter dated September 21, 1993 that he could no longer continue to represent Rahman because they could not arrive at a satisfactory fee arrangement. In a letter dated the same day, the Kunstler firm, already representing two defendants in the case, notified the court that "[f]or some time, persons acting on behalf of" Rahman had asked that firm to be his counsel, and that on the night of September 20, even before the withdrawal letter from retained counsel had been written, "the Sheik was able to reach Mr. Kuby at home, by telephone, and formally requested that we assume representation." The firm simultaneously proffered a notice of appearance. (9/24/93 Memorandum and Order at 1)

The Kunstler firm eventually was permitted to appear in behalf of Rahman, but the government moved in October 1993 to disqualify the Kunstler firm from representing more than one client. I ruled on November 9, 1993 that the firm could represent either El–Gabrowny and Siddig Ali, or Rahman, but not all three, and that in default of a choice the firm would represent clients in the order in which it represented them from the start. As a practical matter this meant that the firm would represent Siddig Ali and El–Gabrowny. *Rahman,* 837 F.Supp. at 72. The Kunstler firm and its clients then refused to make the choice and the firm was disqualified from representing Rahman, who then refused to select appointed counsel or retain counsel, opting instead to represent himself with the assistance of a panel attorney who nonetheless has acted occasionally as Rahman's representative, including at conferences relating to legal issues when Rahman has declined to appear. (*E.g.,* 8/4/94 Tr. 1); *see* Fed.R.Crim.P. 43(c)(3).

In addition to the above representations, the Kunstler firm has represented the former wife of the government's informant, Emad Salem. (7/11/94 Gov't Mem. at 18)

Further, on May 2, 1994 when the government executed a search warrant at the home of Nabil Elmasry, who has performed translation and paralegal services for Rahman, Kuby contacted the court claiming to represent him and demanded that the search be halted. Finally, Kunstler and Kuby sought to represent at sentence the four defendants convicted in the World Trade Center bombing case, *United States v. Salameh*, 93 Cr. 180, and were disqualified on grounds of conflict of interest because those defendants had plain reason at least to consider cooperation with the government, possibly providing information that could help incriminate clients the Kunstler firm was representing or had represented. A mandamus petition to the Second Circuit to permit such representation was denied from the bench.[3]

### B. *The Kunstler Firm's Other Conduct*

#### 1. The Siddig Ali Interviews

In addition to simply representing defendants and others associated with the case who may have conflicting interests, Kunstler and Kuby have participated in conduct that may become the subject of proof at trial. On July 11, 1993 Kunstler appeared on television with his then-client, Siddig Ali, in an interview in which the latter denied participating in any bombing conspiracy. (McCarthy Aff. ¶ 7a) Thereafter, Siddig Ali gave another interview denying any bombing conspiracy. (*Id.* ¶ 7b) The government has said that Siddig Ali stated during the proffer sessions (i) he made the denials during the television interview on Kunstler's advice to pursue a strategy of blanket denial, (ii) he did the same in other interviews after being advised to do so by Kuby as part of a campaign to influence public opinion, and (iii) the denials were false. (*Id.*)[4]

#### 2. El–Gabrowny's Possession of the Nosair Passports

The Kunstler firm has submitted to this court and to the Court of Appeals inconsistent explanations for El–Gabrowny's possession at the time of his arrest of forged Nicaraguan passports carrying the photographs of Nosair and his family but bearing assumed names. In March 1993 the Kunstler firm stated in a brief to the Court of Appeals that the passports were intended to be used by Nosair following his release from prison in order to escape anticipated retribution from Jewish organizations (3/29/93 El–Gabrowny Br. at 16), notwithstanding that the passports bear an expiration date before Nosair's

---

3. Kunstler and Kuby had earlier claimed in press interviews that they had evidence the government's informant, Emad Salem, was responsible for the World Trade Center explosion. *See, e.g.*, Patricia Cohen, "Defense: Spy Was Bomber," *Newsday*, Dec. 15, 1993 at 7. Although, as mentioned, they later sought to represent the World Trade Center defendants, the lawyer for one of the defendants in that case, Mahmoud Abouhalima, complained to the court that Kunstler and Kuby had never shared the alleged evidence with counsel during the trial, and concluded that Kunstler and Kuby were seeking to represent the World Trade Center defendants "for [their] own exclusive photo opportunity." (3/31/94 Abdellah Ltr. at 1)

4. This calls to mind what occurred in open court on July 30, 1993, at a hearing pursuant to *Curcio*, to determine whether Siddig Ali and El–Gabrowny were aware of their right to be represented by conflict-free counsel—a hearing held over the protest of the Kunstler firm that no hearing was necessary. Siddig Ali and El–Gabrowny met with Kunstler and Kuby in a jury room adjoining the courtroom, and Siddig Ali then gave what sounded like a rehearsed answer only marginally responsive to a question posed by the court:

THE COURT: Understanding what I just explained, and after having consulted both with Mr. Kunstler and Mr. Kuby, and with Ms. Scolari [CJA counsel appointed to consult with Siddig Ali, also over the protest of the Kunstler firm], do you want to continue in this case to be represented by Mr. Kunstler and Mr. Kuby? DEFENDANT SIDDIG ALI: Your Honor, I would like you to know that I conceive fully that I will be represented by Mr. Kuby and Mr. Kunstler and that will never put me in any conflict with my codefendant or any other codefendants, [b]ecause I believe that my codefendant and myself are innocent people. My conflict is not with my co-defendant or with anybody else, but it is with the government, with the FBI, and with those people who are accusing me of doing things or saying things that I have not conspired or done. *Rahman*, 837 F.Supp. at 66 (quoting 7/30/93 Tr. 16). Rahman, when he was represented by the Kunstler firm, would repeat at his own *Curcio* hearing the same formulaic insistence that claimed innocence overcame any potential for conflict. *Id.* at 67, 68 (quoting 10/15/93 Tr. 8, 9).

scheduled release. In January 1994 the Kunstler firm told this court that the passports were obtained by Nosair before he was convicted, in anticipation of his having to flee from Zionist retribution after his anticipated acquittal, notwithstanding that they bear an issuance date after he was imprisoned. (1/5/94 Ltr. at 3–4) In July 1993 Kunstler suggested to this court, in an affirmation submitted under penalty of perjury, that he had a basis to prove that the passports in question had been given to El–Gabrowny by Emad Salem, a government informant, as part of a plan to help Nosair escape from Attica Correctional Facility, a plan El–Gabrowny allegedly had rejected. (7/14/93 Kunstler Aff. ¶ 3) The government argues that these statements constitute admissible evidence because they were made by agents of El–Gabrowny (7/28/94 Gov't. Mem. at 42), presumably on the government's direct case. *See* Fed.R.Evid. 801(d)(2). However, without passing on whether such statements would be admissible on the government's direct case, it is at least possible they would be referred to should El–Gabrowny testify.

### 3. The Nosair Defense Fund Allegedly Administered by El–Gabrowny

Finally, the government has stated that it will prove El–Gabrowny administered a fund, raised through contributions solicited from the public, which was supposed to have been used to defray expenses incurred to defend Nosair in the state case but which was actually used in part to further the seditious activities charged in Count One. (7/28/94 Gov't Mem. at 33–38 & Ex. A at 8) The government has proffered evidence based on records seized during a search of El–Gabrowny's apartment that about $290,000 was raised for the fund. The government has proffered evidence also that the Kunstler firm and its former client Nosair at various times has made statements suggesting the amount available for legal fees was far less. Thus, although the fund allegedly was established in December 1990, Nosair was quoted as having told a state court judge in May 1991 that he was uncertain as to the existence of the fund and that he was unable to pay legal fees at a time when the balance in the fund allegedly exceeded $100,000.

(7/28/94 Gov't Mem. at 34 (citing *People v. Nosair*, 6/25/91 Tr. 23 (referring to May 1991 proceedings))) Kunstler was quoted by that state court judge as having told the court that there were no funds, that if money was raised it was for bail and since no bail had been set the money had been returned. (*Id.* at 35 (citing *People v. Nosair*, 6/25/91 Tr. at 14–20))

The government has stated it will show that Nosair was recorded at Attica in "late 1992" complaining about how the fund was being administered and that the Kunstler firm among others was trying to take the funds. (7/28/94 Gov't Mem. at 37) Nonetheless, Kunstler is said to have affirmed in aid of Nosair's petition for leave to appeal *in forma pauperis* that he and his firm had received a fee of $25,000 in installments, that the defense fund was depleted and that at least part of it had been used to pay for the support of Nosair's family, while Nosair's wife allegedly complained to Nosair that she lacked funds. (*Id.* at 37–38) Most recently, Kunstler has been quoted as denying any awareness at all of a Nosair defense fund. "I know nothing of any Nosair defense fund. All I know is that I was paid in dribs and drabs." Ronald Sullivan, "U.S. Moves to Exclude 2 Lawyers," *The New York Times*, July 7, 1994 at B4 (cited in 7/28/94 Gov't Mem. at 38).

### 4. Other Conduct by the Kunstler Firm

In an *ex parte* submission that has been placed under seal, the government has proffered additional conduct by the Kunstler firm that could be the subject of testimony at trial. It is unclear at present whether the government would try to prove such conduct even if it could, and also whether such conduct could be proved only if Siddig Ali testified, or could be independently proved (7/29/94 McCarthy Aff. (received *ex parte* and sealed) ¶¶ 11–15), as the government acknowledged in an *ex parte* proceeding. Because it is highly speculative that any of this evidence may be presented at trial, this portion of the government's *ex parte* submission has not been considered in deciding this motion. *See supra* p. 270 n. 2.

### III.

The above facts generate legal problems that fall into two broad categories: the conflict-of-interest problems and the lawyer-as-unsworn-witness problems.

#### A. Conflict of Interest

As was pointed out the last time there was occasion to consider the Kunstler firm's multiple representation, a defendant's Sixth Amendment right to counsel protects him against ineffective assistance of counsel, and in particular against prejudice, demonstrated or presumed, resulting from his counsel's conflicts of interest, actual or potential. *Rahman*, 837 F.Supp. at 69, and cases cited therein. "An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests 'diverge with respect to a material factual or legal issue or to a course of action.'" *Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir.1993) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 356 n. 3, 100 S.Ct. 1708, 1722 n. 3, 64 L.Ed.2d 333 (1980)), *cert. denied*, —— U.S. ——, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994).

■ The divergence of interest that signals an actual conflict may arise from two sources: (i) the lawyer's personal interest, such as when the lawyer may risk incriminating himself or incurring the hostility of a prosecutor he knows to be investigating him by pursuing a strategy that could help his client; or (ii) from the lawyer's professional interest, resulting from his obligation to protect the interest of another present or former client when the interest of that other client diverges from the interest of the client in question. *Levy*, 25 F.3d at 155–57. It bears emphasis that *Levy* reiterated a lawyer's obligation to protect former clients as well as current ones, thereby validating Judge Weinfeld's observation more than 40 years ago:

> A lawyer's duty of absolute loyalty to his client's interests does not end with his retainer. He is enjoined for all time, except as he may be released by law, from disclosing matters revealed to him by reason of the confidential relationship. Related to this principle is the rule that where any substantial relationship can be shown between the subject matter of a former representation and that of a subsequent adverse representation, the latter will be prohibited.

*T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113 F.Supp. 265, 268 (S.D.N.Y.1953).

Further, in a case in which there are myriad conflicts, each cannot be considered in isolation, but rather must be considered together when assessing whether there is a congruence of interests between the lawyer and his client. *Levy*, 25 F.3d at 157.

The court's obligation when even the possibility of a conflict of interest appears is to inquire into the interests of the lawyer so as to identify "whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." *Levy*, 25 F.3d at 153.

> If the court discovers that the attorney suffers from a severe conflict—such that no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation—the court is obliged to disqualify the attorney[.] If the court discovers that the attorney suffers from a lesser or only a potential conflict—such that a rational defendant could knowingly and intelligently desire the conflicted lawyer's representation—the court should follow the procedure set out in *Curcio*, 680 F.2d at 888–90, in order to obtain directly from a defendant a valid waiver of his right to a non-conflicted lawyer[.]

*Id.* (citations omitted).

■ In deciding whether to accept or reject a defendant's waiver of one or more conflicts of interest, a court must "recognize a presumption in favor of [defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Wheat v. United States*, 486 U.S. 153, 164, 108 S.Ct. 1692, 1700, 100 L.Ed.2d 140 (1988). However, the Court recognized in *Wheat* the context in which that decision is made, and prescribed a notably flexible standard:

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of inter-

est by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics. Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.

For these reasons, we think the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.

*Wheat,* 486 U.S. at 162–63, 108 S.Ct. at 1699. Thus, as in *Wheat* and as in *United States ex rel. Stewart v. Kelly,* 870 F.2d 854, 857–58 (2d Cir.1989), a waiver of conflict is not binding on the court if the conflict is nonetheless actually or potentially substantial.[5] The authority of *Wheat* makes clear that that part of the *Levy* test which involves an assessment of how serious the conflict is, must include not only actual but also potential conflicts, and must include as well both a prudent awareness of how little can be pre-

dicted with certainty before a trial begins and a sober regard for how much can go wrong once a trial starts.

### B. *Lawyer as Unsworn Witness*

"[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat,* 486 U.S. at 159, 108 S.Ct. at 1697. Among the limitations on the right to select a particular lawyer, other than those resulting from that lawyer's conflicts of interest or simple unavailability within a reasonable time, *see United States v. Locascio,* 6 F.3d 924, 931 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994), are limitations that may be imposed because "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat,* 486 U.S. at 160, 108 S.Ct. at 1698.

The ethical standards a court has an independent responsibility to preserve include a rule that may require a lawyer to withdraw from representing a client when that lawyer is in a position to be a witness. *See, e.g.,* N.Y.Jud.Law DR 5–102(A) (McKinney 1993).

Even if the attorney is not called, however, he can still be disqualified, since his performance as an advocate can be impaired by his relationship to the events in question. For example, the attorney may be constrained from making certain arguments on behalf of his client because of his own involvement, or may be tempted to minimize his own conduct at the expense of his client. Moreover, his role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the

---

5. To the extent the court's earlier opinion in this case dealing with the government's motion to limit the Kunstler firm's representation of defendants suggests that only actual conflicts may give rise to a constitutional defect in representation,

*Rahman,* 837 F.Supp. at 70, that suggestion is incorrect. Even a potential conflict that ripens into prejudice to a defendant causes a violation of the Sixth Amendment. *Levy,* 25 F.3d at 152.

jury his first-hand knowledge of the events without having to swear an oath or be subject to cross-examination.

*Locascio*, 6 F.3d at 933. Indeed, proof at trial about a lawyer's conduct may be such that his very presence at counsel table would itself distort the factfinding process by implying to the jury the court's endorsement or condonation of that conduct. *United States v. Castellano*, 610 F.Supp. 1151, 1167 (S.D.N.Y.1985), *cited with approval in Locascio*, 6 F.3d at 933.

### IV.

#### A. *Conflicts in Resuming Representation of Siddig Ali*

■ Although Siddig Ali most recently decided he did not wish to resume being represented by the Kunstler firm, any possible recurrence of that issue should be laid to rest for good and all. If Kunstler and Kuby were to represent Siddig Ali, one substantial matter on which they would have to consult with and advise him would be whether or not to testify. As the above facts make clear, their advice to him would come burdened with the knowledge that he could be cross-examined about statements Siddig Ali made to the government dealing with not only El-Gabrowny, a current client of the firm, but also with Rahman and Nosair, past clients of the firm who are defendants in this case, and possibly with Sattar and Haggag, also past clients of the firm. It would come burdened also with the knowledge that Siddig Ali could be cross-examined about statements he made with respect to Kunstler and Kuby themselves. That in itself would warrant disqualification, regardless of any waiver.

Beyond that, many of the tape recordings in the case include Siddig Ali's voice. Counsel to El-Gabrowny might well wish to make arguments distancing his client from Siddig Ali, arguments that would be highly prejudicial to Siddig Ali's interest, in violation of their ongoing duty of loyalty to him. *Levy*, 25 F.3d at 156.

Further, the Kunstler firm, despite that duty, has (i) publicly accused its former client of lying, (ii) submitted to the court a letter stating that Siddig Ali admitted during a telephone call to Kuby that he lied to the government in his evidentiary proffers (8/16/94 Kunstler and Kuby Ltr. (2 pages) at 1), thereby accusing Siddig Ali of felonies as yet uncharged, *see* 18 U.S.C. §§ 1001 (false statements), 1505 (obstruction), and (iii) urged the court, before Siddig Ali's apparent experiment with cooperation came to an end, to compel their former client to waive his attorney client privilege as the price of entering a guilty plea, a suggestion that itself violated Rule 11(e)(1) of the Federal Rules of Criminal Procedure, which bars the court from participating in plea negotiations. (6/28/94 Tr. at 34–35) To return Siddig Ali's fate to such custodians would violate the court's independent duty to assure that Siddig Ali "receive[s] a trial that is fair and does not contravene the Sixth Amendment." *Wheat*, 486 U.S. at 161, 108 S.Ct. at 1698.

#### B. *Conflicts in Representing El-Gabrowny*

■ Four former clients of the Kunstler firm are defendants in this case: Rahman, Nosair, Siddig Ali, and Haggag. It may be advisable for a lawyer representing El-Gabrowny's interest to make arguments distancing El-Gabrowny from one or all of those defendants, or to adduce evidence helpful to El-Gabrowny but harmful to one or all of those defendants, measures which, if taken by the Kunstler firm, would violate that firm's duty to its former clients and, if not taken, would give rise to arguments by El-Gabrowny on appeal that his lawyer's performance had been adversely affected by a conflict of interest and his conviction therefore should be reversed. *See Levy*, 25 F.3d at 156–58.

The Nosair defense fund is a minefield of potential conflict. Nosair, a former Kunstler firm client, was the intended beneficiary of the fund, but the government has proffered evidence to suggest a substantial part of the proceeds were not spent to benefit him or his family. El-Gabrowny, who administered the fund, is alleged to have made some of its proceeds available for illegal activity. His interest is in proving that as much as possible of the fund was used to pay for Nosair's defense in the state case. Kunstler, one of Nosair's lawyers in the state case, has al-

ready taken the position that the firm received only a small amount in fees, and has cast doubt on whether any of it came from the fund. He is already committed to a view of the facts that disserves El–Gabrowny's and possibly Nosair's interests. *See supra* p. 273.

Although Siddig Ali will not testify as a government witness at trial, it is entirely possible that he will testify in his own defense. If he does, either he would incriminate El–Gabrowny or he would be subject to cross-examination by the government based on statements to the government in which he did. Further, although the court previously discounted the likelihood that Nosair would testify because he had not done so at his state trial, *Rahman,* 837 F.Supp. at 71,[6] Nosair has filed a sealed submission relating to a proposed defense that could require his testimony. Rahman, who is alleged to have approved the seditious acts of others rather than to have acted directly himself, may well testify.

The *Kunstler* firm would be barred ethically from cross-examining any of those defendants, and from cross-examining any other of its former clients, such as Sattar, Elmasry and Haggag, if they were to testify. *Wheat,* 486 U.S. at 164, 108 S.Ct. at 1699. Either El–Gabrowny would have to forgo any cross-examination of any of those witnesses, or the court would have to maintain standby counsel to cross-examine former Kunstler firm clients.

Although the Kunstler firm and El–Gabrowny embraced the standby counsel alternative at the August 23 hearing, going so far as to suggest, incorrectly, that it was the

court's proposal in November 1993 for dealing with conflicts of interest, *see supra* p. 269, that alternative provides no assured solution to the problem. Even if substitute counsel could cross-examine former clients of the Kunstler firm, there is no assurance that information potentially damaging to one of those clients would not appear during the examination of other witnesses. The court and counsel would have to remain constantly alert to detect such potential damage. When it was detected, the Kunstler firm would have to abandon cross-examination relating to such information, and let standby counsel take over. The same problem would afflict openings and summations, with the Kunstler firm barred ethically from making any argument or previewing any proof that could adversely affect any of its former clients at risk in this case. Thus, cross-examination for El–Gabrowny's benefit, and indeed his entire representation, would be conducted in the manner of a fugue, with the Kunstler firm developing only themes that could not damage its former clients, and standby counsel developing the themes that could. Even if such a bizarre scenario were workable—and it is not—any miscalculation of the potential effect of any argument or item of evidence would enable El–Gabrowny to argue on appeal that his representation had been adversely affected by a conflict of interest.

Beyond suggesting that any potential conflict of interest problems can be cured through the standby counsel device, the Kunstler firm has argued principally, in both its submissions to the court[7] and its public pronouncements,[8] that the entire conflict of in-

---

**6.** The same opinion suggested that it was unlikely Siddig Ali would cooperate or that if he testified he would incriminate El–Gabrowny. 837 F.Supp. at 71. "The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials." *Wheat,* 486 U.S. at 162–63, 108 S.Ct. at 1699. Ruefully, amen.

**7.** The firm's initial brief on this motion opened as follows: "Once again, an increasingly desperate government turns to attacking defense counsel as a part of a strategy to obtain convictions, no matter what the cost to the Constitution. In the government's view, the only acceptable role for defense attorneys is to grease the machinery of

justice by convincing clients that their ticket to freedom is to become a taxpayer-supported perjurer. Consequently, the prosecution views aggressive and zealous advocacy as a form of obstruction."

**8.** "Mr. Kuby called the [current] motion 'simply an attempt to get radical lawyers out of the case.'" Ronald Sullivan, "U.S. Moves to Exclude 2 Lawyers," *The New York Times,* July 7, 1994 at B4 col. 4.

"Kunstler and Kuby told reporters after the [*Curcio* ] hearing [when the firm undertook to represent Rahman] that the government's argument for disqualification had no merit and was just part of an effort to 'get rid of us.'"

terest issue is a contrivance conjured by the government as an excuse to get rid of them. Two other defendants, Victor Alvarez and Amir Abdelgani, have chimed in with the assertion that the government lacks standing to raise the conflict of interest issue, an argument the Kunstler firm has rescued from its own deficiencies of standing by adopting it.

■ Addressing the second argument first, not only does the government not lack standing to raise this argument, as noted above, see supra p. 267, it is required under Levy and its precursors to call these matters to the court's attention, as the court was required to pursue them, with reversal likely for failure of either the government or the court to follow prescribed procedures. Levy, 25 F.3d at 152; see also Iorizzo, 786 F.2d at 59.

As to the claim that the issue is a government contrivance to get rid of the Kunstler firm,[9] the miasma of conflicting interests described above is entirely of the Kunstler firm's own creation. Even if one were to assume that the firm did nothing to encourage multiple representation, an assumption that founders on the firm's performance in the Salameh case, where it sought to represent the defendants convicted in the World Trade Center bombing, see supra pp. 271–272, no one forced the firm to assume multiple representation.

In Wheat, varying degrees of culpability among three jointly represented clients and the need for vigorous cross-examination of one loomed as obstacles to competent representation, and disqualification was upheld. In Stewart, defense counsel previously had represented the informant in an unrelated matter, and offered to limit cross-examination to the informant's criminal record. 870 F.2d at 855. Nonetheless, the compromise was found "not acceptable professional conduct," and disqualification was upheld even though the prior representation was in con-

nection with another matter. Id. at 857. In this case, the prior representation was in connection with related matters. The conflicts of interest posed by the Kunstler firm's continued representation of El–Gabrowny are at least as dire as those that justified disqualification of counsel in Wheat and Stewart, particularly when considered not separately, but together, as Levy says they must be. Levy, 25 F.3d at 157. Just as important, the conflicts here, by their sheer number if nothing else, are at least comparable to the ones that necessitated reversal in Levy, where counsel earlier had represented a co-defendant who had fled, and counsel himself was suspected of complicity in that flight and in other criminal activity. Based on these actual and potential conflicts of interest, El–Gabrowny's waiver cannot be accepted and the Kunstler firm must be disqualified.

## C. Kunstler and Kuby as Unsworn Witnesses

■ The status of Kunstler and Kuby as potential unsworn witnesses, to the extent it can be discerned now, emerges from (i) Kunstler's joint television appearance with Siddig Ali, and the latter's subsequent statement to the government that this appearance and other interviews included false statements as part of a strategy Kunstler and Kuby recommended, see supra p. 272; (ii) their statements to this court and to the Court of Appeals about how El–Gabrowny came to possess the forged passports, see supra pp. 272–273; and (iii) their statements about how much they received of the funds raised for Nosair's defense, combined with the government's proffer of illicit uses to which those funds were put. See supra pp. 273–274.

The first of these items of proof becomes a problem only if Siddig Ali testifies. If he does not, there may be no occasion for Kunstler and Kuby to "subtly impart to the jury

---

" 'They are trying to limit this to lawyers who are not of our stripe,' Kunstler said." Gail Appleson, "Sheik Insists He Has Nothing To Do With Bombing," Reuters, Oct. 15, 1993 (available on Lexis).

9. Whether the accomplishments and stature of the Kunstler firm, as described herein and otherwise, are such that the government would wish to have them replaced with less formidable counsel, is an issue that need not be reached in order to resolve the current motion.

[their] first-hand knowledge of the events without having to swear an oath or be subject to cross-examination." *Locascio*, 6 F.3d at 933. However, the possibility of his testimony exists regardless of his status in the case, and that possibility must be considered. The Kunstler firm has brushed aside issues arising from their involvement in Siddig Ali's public statements with a *tu quoque* argument, as follows: If defense counsel may be disqualified because they have potential unsworn testimony on the subject of how their former client came to make prior inconsistent statements, government counsel also must be disqualified because they are potential witnesses on the prior inconsistent statements of the witnesses they call. That argument rests on two assumptions, neither of which is valid: first, that there is particular reason to believe that a witness will testify that a government lawyer told him to lie—there isn't; second, that the relationship between a lawyer and a client is the same for disqualification purposes as the relationship between a lawyer and a non-client witness—it isn't.

The other two items of proof that present the Kunstler firm as potential unsworn witnesses—statements about the forged passports and evidence relating to the Nosair defense fund—inhere in any continued representation of El–Gabrowny, in whose behalf counsel made statements about the passports and who is alleged to have been the administrator of the Nosair defense fund. They are imminent whether Siddig Ali testifies or not.

It is arguable that these unsworn witness problems are not as substantial as those presented in *Locascio,* where the proof would have suggested the disqualified attorney was house counsel to the RICO enterprise charged in the indictment. 6 F.3d at 933. However, they are nonetheless substantial, even without considering the government's suggestion that the Kunstler firm's activities in representing those whom the government contacted, and otherwise, may be read to show house counsel status. (7/28/94 Gov't Mem. at 30 n. \*)

The firm's response to the unsworn witness problems, other than as set forth above, has been the same as its response to the conflict of interest problems, and may be responded to in much the same way: first, the government was obligated to raise the issue; second, even if one were to take the kindest view of how the firm came to be enmeshed in facts that will be proved at trial, and one were to assume that such involvement arose from a perceived need to correct a hostile public view of blameless clients, no one forced these lawyers to test-fly their defense theories in public and in court documents, and to say and do things that could be proved against their client at trial.

It is not necessary to consider whether these unsworn witness problems, standing alone, would be enough to warrant disqualification. They do not stand alone, and may not be considered alone. Rather, they should be considered together with the conflict of interest problems discussed above, *cf. Levy,* 25 F.3d at 157 (conflicts of interest should be considered together, not individually), and—bearing in mind that this decision must be made before the trial—together also with a realistic projection, if one is possible, of how sensitive the Kunstler firm is likely to be in avoiding future conflicts of interest and future entanglement in the underlying facts. That projection is not reassuring. As disclosed by the record summarized above, the Kunstler firm from the outset has either denied the existence of the problems discussed above, or trivialized them, objecting to the initial *Curcio* hearing in this case, *Rahman,* 837 F.Supp. at 66, and proffering without basis a blanket waiver on El–Gabrowny's behalf as recently as August 18. *See supra* p. 270.

The Kunstler firm's involvement in possible relevant proof at trial and its record of dealing with these issues in this case simply add weight to the conclusion that the motion to disqualify the firm must be granted.

The government's motion is granted. The Kunstler firm is disqualified from representing either Siddig Ali or El–Gabrowny at trial.

SO ORDERED.