**UNITED STATES of America, Appellee,**

v.

**Lawrence Salvatore IORIZZO, Defendant-Appellant.**

No. 85–1094.

United States Court of Appeals, Second Circuit.

Argued Aug. 15, 1985.

Decided March 11, 1986.

Lawrence F. Ruggiero, New York City (Richard A. Greenberg, New York City, of counsel), for defendant-appellant.

Mervyn Hamburg, Dept. of Justice, Washington, D.C. (Raymond J. Dearie, U.S. Atty. for the E.D.N.Y., of counsel), for appellee.

Before NEWMAN and WINTER, Circuit Judges, and HOLDEN, District Judge.*

* The Honorable James S. Holden, Judge, United States District Court for the District of Vermont,

WINTER, Circuit Judge:·

Lawrence S. Iorizzo appeals from various convictions by two juries before Judge Altimari in the Eastern District of New York. Iorizzo was charged in a sixteen count indictment with mail and wire fraud, 18 U.S.C. §§ 1341, 1343 (1982), as well as with the interstate transportation of stolen property, 18 U.S.C. § 2314 (1982). These charges arose out of his activities as president and principal owner of Vantage Petroleum Corporation ("Vantage") and various affiliated companies he owned or controlled. There were three categories of counts. Counts 1–5 were dismissed before trial on the government's motion and no longer concern us. Counts 6–13, alleging mail fraud, concerned a scheme to defraud New York State out of gasoline excise and sales taxes from June, 1979 to August, 1981. Counts 14–16 alleged wire fraud and the interstate transportation of stolen property. They concerned a scheme in which the defendant allegedly defrauded Ashland Petroleum Company out of more than $500,000 of gasoline during the period January-February 1982 and caused some of that gasoline to be transported from New Jersey to New York.

The trial of the mail fraud counts (6–13) was severed from that of the Ashland counts (14–16), the former being held in April, 1984, the latter in June of the same year. Defendant was represented by the same attorney in both trials. In the first trial, the jury returned guilty verdicts on all eight counts. The second trial resulted in one conviction and one acquittal on the wire fraud counts, and a conviction on the interstate transportation count. Iorizzo was sentenced to concurrent five-year terms of imprisonment and a five-year term of probation, and ordered to pay $19,000 in fines and approximately $1.7 million in restitution.

Finding that Iorizzo did not have the assistance of a counsel free from conflicts

sitting by designation.

of interest that affected the trial, we reverse the mail fraud convictions and remand. We reverse the wire fraud conviction and dismiss this count because of the lack of a nexus between the use of the wires and the fraudulent scheme. We find no error in the conviction for interstate transportation of stolen property but remand for further proceedings to determine the applicability of *United States v. Cancilla*, 725 F.2d 867 (2d Cir.1984).

## I. THE MAIL FRAUD CONVICTIONS

■ The scheme to evade state gasoline taxes involved use of the mails to file allegedly fraudulent New York State excise and sales tax returns. As a motor fuel distributor licensed by New York State, Vantage was required to prepare and file such returns. The amount of tax owed was determined by subtracting Vantage's closing inventory for the relevant period from its opening inventory, with certain adjustments of no relevance to this appeal. The statutory rate was then applied to this amount.

The government sought to prove that Iorizzo caused Vantage's tax liability to be minimized by periodically inflating the closing inventory figures and thus reducing reported sales. The government's key witness in this regard was James Tietz, a supervisor in Vantage's accounting department who was principally responsible for preparing tax returns for Vantage and various affiliated companies. He testified that he was instructed by Iorizzo to manipulate sales and inventory figures so as to match the companies' tax liability with the amount of discretionary cash the firms had available for the payment of taxes. According to his testimony, Tietz had misgivings about his conduct, despite Iorizzo's assurances that the unpaid taxes would be made up later, and at times refused to sign the false returns. He also testified that he and an associate embezzled funds from Vantage by cashing paychecks issued to non-existent employees but that Iorizzo agreed not to pursue the matter so long as

Tietz resumed signing the false state tax forms.

Tietz's relationship to Iorizzo's defense counsel gives rise to a major issue on this appeal. In 1981, New York authorities were investigating Vantage's and the affiliated corporations' compliance with the gasoline excise and sales tax. Tietz and two other employees of these corporations were subpoenaed and testified under oath at a hearing before the State Tax Commission. At that hearing, they were represented by the same attorney who served as Iorizzo's defense counsel at the trials that are the subject of the present appeal. Events at the mail fraud trial suggest that Iorizzo paid the lawyer to represent these witnesses. Tietz's testimony at the prior hearing pertained to his role in preparing and filing certain sales and payroll tax returns for Vantage and certain of the affiliated companies. Although the testimony before the Tax Commission did not cover exactly the same period of time as the indictment, there was overlap. Tietz's testimony on that occasion in no way either admitted the falsity of the returns or implicated Iorizzo in a scheme to file false returns.

The potential conflict of interest arising from defense counsel's role as Iorizzo's advocate at the mail fraud trial and his earlier representation of the government's key witness in a related state proceeding was evident to the prosecution prior to trial. At a pretrial proceeding, the government, through a New York state prosecutor specially deputized to try this case, raised the issue of whether defense counsel was disqualified. He told the district court:

Any doubt that may have existed before as to a conflict or any shadow has been removed by [defense counsel]. He chose to represent Mr. Tietz at that time, he chooses to represent Mr. Iorizzo now. If he gathered any confidential information ... which he intends to use at trial, I think there's a conflict. I think the government has certain rights when there is a conflict among attorneys and I

think this is now highlighted and respectfully I think the Court is forced to rule now whether [defense counsel] can continue representing this client if this matter is critical. Mr. Tietz will be a witness subject to cross-examination.

The court instructed the government that in the event it chose to pursue the disqualification issue, it must do so in writing. The prosecutors failed to make a written objection, however.

During his opening statement at trial, defense counsel promised to show the jury that the government's case was "based almost entirely on the testimony of a thief, a liar and a forgerer—one James Tietz." During Tietz's extended cross-examination, defense counsel asked him whether he remembered testifying before the State Tax Commission. Counsel for the government immediately asked for a sidebar conference at which they strenuously objected to any cross-examination regarding Tietz's earlier testimony. The grounds stated by the deputized prosecutor were that any cross-examination of the witness "about testimony ... where he represented him ... is completely improper." The regular Assistant United States Attorney, a prosecutor with considerable experience, told the district judge, "[T]his is the clearest conflict I have ever seen."

Defense counsel stated that his purpose was to induce Tietz to confirm the accuracy of his prior statements, which neither admitted the falsity of the tax returns nor implicated Iorizzo. Defense counsel thus stated at one point:

I am going to ask this witness some questions. If he testifies truthfully, I probably will not have to refer to this.

If he lies, I am going to confront him with his prior sworn testimony which this is a transcript.

If he says he does not remember, I will show him the appropriate part of the transcript and ask him if it refreshes his recollection. I will not go beyond the transcript. This is merely to make sure that his testimony is consistent which is perfectly proper cross examination.

The district judge agreed that defense counsel indeed had a conflict but nevertheless stated that cross-examination might proceed. He stated:

[Y]our professional integrity is your responsibility not mine.

I'm going to allow you to cross-examine but not with any blessings on the part of this Court. I do not condone it. I make no judgments about it.

And if indeed an appropriate committee feels that what you are doing here is wrong, then do not indicate that this Court condoned the cross-examination.

The judge also noted that, because defense counsel had represented Tietz when the latter made the statements in question, the prosecution might well call defense counsel as a witness should Tietz's credibility be impaired by the cross-examination. The judge pointed out that such circumstances would implicate the canons of ethics.

After further colloquy, the judge altered his position slightly:

When you go to the podium, you are to take this [transcript] and put it down on the podium and never again to pick it up. You may ask him questions very well prepared as a result of reading this. You will not confront the witness with this.

[DEFENSE COUNSEL]: Fine.

THE COURT: If indeed there is a variance, then at a sidebar in the absence of the jury some way we will take up this question of conflict.

On the face of it it appears that you are in conflict at this point. But it is a late stage at this point, and we are in the middle of the trial.

I will not disrupt the trial except we may get past it without making a judgment on it.

[DEPUTIZED PROSECUTOR]: I think the witness, rather than be ambushed, should be allowed to read this transcript.

\* \* \* \* \* \*

THE COURT: That makes a lot of sense to me.

The issue was then put aside until the next day in order to give Tietz an opportunity to read the transcript of his testimony before the State Tax Commission. That day, the following occurred:

THE COURT: * * * *

Before the Jury comes in ... Is there any problem in regard to the alleged conflict of interests? That is, the conflict as to the counts for the present Defendant and the witness, Mr. Tietz, on the stand now?

[DEPUTIZED PROSECUTOR]: I would just inquire from Counsel if he intends to pursue any further questioning regarding that.

[DEFENSE COUNSEL]: I do not.

THE COURT: Thank you.

[ASSISTANT UNITED STATES ATTORNEY]: I would also ask that the Defendant through Counsel be informed by the Court that most of the discussions were at side bar and waived—or at indicated to the Court that he is satisfied with [defense counsel's] representation even if there is a conflict because we don't know what [defense counsel] was privy to.

* * * * * *

The question is, I don't want a question raised should there be an appeal, that there was ineffectiveness of Counsel because [defense counsel] was representing him and also—

THE COURT: Counsel, two weeks ago the Second Circuit spoke on this point, this very point. And that is a point well taken.

So, in the presence of this Court and on the record you must explain to your client [w]hat he already knows, which is, that Mr. Tietz was at one time represented by you, that you now decline to question him concerning certain testimony offered by Mr. Tietz under oath, and that you made a judgment, a professional judgment, that there is no need or reason for your confronting this witness with or without a transcript.

[DEFENSE COUNSEL]: Mr. Iorizzo, in March of 1981, was I retained by the Vantage—or was I representing the Van-

tage Petroleum Corporation in connection with an investigation into Salvan Management, P.C.I., and Martin Carey concerning certain alleged sales tax frauds?

[ASSISTANT UNITED STATES ATTORNEY]: Your honor, I have no wish to ask that the defendant testify under oath. I just wanted the defendant to acknowledge to the Court that he understands what is going on.

THE COURT: No. I think it can never be construed to constitute testimony. It is for a simple single purpose—

[ASSISTANT UNITED STATES ATTORNEY]: Fine.

THE COURT: (continuing) of stating for the record that he understands what happened and he is satisfied with [defense counsel's] representation.

* * * * * *

[DEFENSE COUNSEL]: And your answer, sir?

THE DEFENDANT: Yes.

[DEFENSE COUNSEL]: All right. Were you at that time President of Vantage Corporation?

[THE DEFENDANT]: Yes.

[DEFENSE COUNSEL]: All right. Did you request me to represent not only the corporation but any of the corporate employees who were called to testify in that matter?

THE DEFENDANT: Yes.

[DEFENSE COUNSEL]: And was one of the employees, one of the Vantage employees who was called to testify before the New York State Tax Department, one James Tietz?

THE DEFENDANT: Yes.

[DEFENSE COUNSEL]: Did you ask me to represent Mr. Tietz in that proceeding?

THE DEFENDANT: Yes.

[DEFENSE COUNSEL]: All right.

Now, we have a transcript of Mr. Tietz' testimony at that proceeding. And I have agreed with the Court that I will not ask any questions of Mr. Tietz con-

cerning evidence that he gave in that proceeding. Do you understand that?

THE DEFENDANT: I understand that.

[DEFENSE COUNSEL]: All right. Are you willing for me to forego that area of examination, of cross examination?

THE DEFENDANT: Yes.

Iorizzo, represented by new counsel on this appeal, argues that he was deprived of the effective assistance of counsel by the events described above. The government responds with arguments that are entirely at odds with the position it took in the district court. It contends that: (i) defense counsel was not burdened by a conflict of interest but had "merely made an appearance on behalf of Tietz at an unrelated state hearing years before...."; (ii) the proposed cross-examination was never connected to "any relevant area of inquiry that [defense counsel] had elected to forego as a result of his decision not to ask about the State Tax Commission hearing"; and (iii) Iorizzo has waived the issue. We agree with appellant and reject the government's contentions.

In attempting to represent Iorizzo in this matter, trial counsel was confronted with an unavoidable conflict of interest. Tietz was the key government witness against Iorizzo. His previous testimony under oath was clearly relevant to the testimony he gave at trial about Iorizzo's instructions with regard to signing false sales tax returns. Because Tietz's prior statements had been made at a time when defense counsel was representing him, the prior testimony could not be used to attack Tietz's credibility without putting defense counsel's role before the State Tax Commission in issue. Any such attempt would open the way for Tietz to be asked on redirect about his legal representation at the State Tax Commission hearing and about any advice he had received from defense counsel at that time. Moreover, the government might well have called trial counsel as a witness not only to interrogate him about advice to Tietz but also to bring out the fact that Iorizzo apparently was paying him to represent Tietz before the State Tax Commission. Even if the government did not call defense counsel and even if he had rendered no advice to Tietz with regard to his prior testimony, he should then have been available to testify on behalf of Iorizzo to dispel any impression left upon the jury that he had been responsible for Tietz's testimony. Finally, whether or not he actually testified, his firsthand involvement in Tietz's testimony would cause any argument to the jury about that testimony to be viewed as a statement of a witness as well as of an advocate. Our prior decisions indicate that such circumstances constitute a disqualifying conflict under Disciplinary Rule 5–102(A). *United States v. McKeon*, 738 F.2d 26, 34–35 (2d Cir.1984).

Moreover, the existence of this conflict of interest led defense counsel to forego a most relevant line of inquiry.[1] As the government's key witness, Tietz' credibility went directly to the guilt or innocence of the defendant. A key witness' prior statements under oath that cast doubt upon the accuracy of his trial testimony are an obvious subject of potential cross-examination. Had this cross-examination been foreclosed on grounds of relevance by an evidentiary ruling of the trial court, that surely would have been reversible error.

We perceive no reason to alter this result because trial counsel decided voluntarily to forgo what he believed to be a relevant line of inquiry after being vigorously challenged by the government and advised by the district court of its skepticism as to the ethical propriety of the cross-examination. The district court might well have permitted a full exploration of Tietz's prior testimony had trial counsel persisted. However, the spectre of a disciplinary hearing

---

1. Two other employees of Vantage and the affiliated corporations testified at the State Tax Commission hearing and were also represented by Iorizzo's defense counsel. They were witnesses at the mail fraud trial and testified after Tietz. They too were not cross-examined with regard to their prior testimony. The present record does not reveal whether there was a basis for cross-examination with regard to that testimony.

was explicitly raised, and defense counsel was on warning that further inquiry would be at risk to his professional reputation and employment.

The decision to forgo inquiry into Tietz's prior testimony was not the result of a tactical judgment by a conflict-free lawyer that such evidence would not be helpful to Iorizzo. Rather, the government's objections and the trial court's admonitions to defense counsel related exclusively to the ethical impropriety of the cross-examination by this particular attorney.[2] The decision to forgo inquiry was thus made solely to protect the interests of defense counsel.

Supreme Court decisions require us to reverse the convictions in such circumstances.[3] Defendants who make ineffective assistance claims based solely on errors or omissions in pretrial investigations or trial strategy must, to succeed, meet a more stringent test than those who base such a claim on an attorney's conflict of interest. In the former case, the defendant must show: "First ... that counsel's performance was deficient ... [s]econd, ... that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). However, a defendant claiming that the assistance of counsel was ineffective due to the counsel's conflict of interest need not establish prejudice. Rather, prejudice is presumed when counsel is

> burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid con-

flicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, see, e.g., Fed.Rule Crim.Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and 'that an actual conflict of interest adversely affected his lawyer's performance.' *Cuyler v. Sullivan, supra,* 446 U.S., at 350, 348, 90 S.Ct., at 1719, 1718 (footnote omitted).

*Strickland v. Washington, supra,* 104 S.Ct. at 2067.

Thus, once the defendant establishes that there was an actual conflict, he need not prove prejudice, but simply that a "lapse in representation," *Cuyler v. Sullivan,* 446 U.S. 335, 349, 100 S.Ct. 1708, 1718–19, 64 L.Ed.2d 333 (1980), resulted from the conflict.

Such a lapse occurred in the present case when trial counsel abandoned his cross-examination of the government's key witness as to prior testimony. This examination never got off the ground because of the objections by the government based solely upon defense counsel's conflict of interest. At the time, its abandonment was viewed by all concerned as necessary to allow defense counsel to avoid ethically improper conduct. Iorizzo, however, was entitled to a counsel unburdened by the ethical constraints resulting from prior representation of the government's key witness.

■ We turn now to the government's contention that Iorizzo validly waived his

---

**2.** The only statement even hinting that other reasons might have been behind the decision not to cross-examine occurred during the colloquy relating to Iorizzo's waiver of his rights in that regard. At that point, the district judge told defense counsel to explain to Iorizzo that he, defense counsel, had made "a professional judgment that there is no need or reason for your confronting this witness with or without a transcript." Even if such an explanation had been

given, the record would not support the conclusion that such a judgment had been made. However, the explanation was not given.

**3.** We do not reach, therefore, Iorizzo's claim on appeal that defense counsel's trial strategy and overall performance amounted to ineffective assistance of counsel.

right to a counsel so unburdened and to a full cross-examination of Tietz. In *United States v. Curcio,* 680 F.2d 881 (2d Cir.1982) (*"Curcio I"*), we established procedures to be followed in situations in which a criminal defendant states that he desires to waive his right to representation by an attorney without a conflict of interest. Although *Curcio I* differs from the present case in that multiple representation was in issue, we regard those procedures as applicable here. In that case we directed that the trial court should: (i) advise the defendant of the dangers arising from the particular conflict; (ii) determine through questions that are likely to be answered in narrative form whether the defendant understands those risks and freely chooses to run them; and (iii) give the defendant time to digest and contemplate the risks after encouraging him or her to seek advice from independent counsel. *Id.* at 888–90.

None of these steps was taken in the present case. The inquiry was conducted not by the court, but by the very attorney whose capacity to act in the defendant's interests was under challenge. The risks of forgoing relevant cross-examination of Tietz were not explained to the defendant, and the questions that were asked called only for a "yes" or "no" answer. Finally, Iorizzo had to decide on the spot, without time to consider the matter or to seek the advice of independent counsel, a possibility that was never mentioned to him. Iorizzo, therefore, did not validly waive his rights.

█ We add a final note. The reversal here is the direct result of the prosecution's using defense counsel's conflict of interest as a means of affecting the evidence going before the jury instead of moving for his disqualification before the trial. The prosecutors here were aware of defense counsel's conflict of interest at an early stage and were invited by the district judge to make a disqualification motion in writing. We trust that this decision will ensure that a pretrial disposition of such issues will occur in the future.

## II. THE ASHLAND CONVICTIONS

█ Iorizzo also challenges his convictions on wire fraud and interstate transportation of stolen property. These counts were tried separately, and our disposition of the mail fraud counts does not affect these convictions.

Ashland was a large oil company with which Vantage had an ongoing relationship. The record reveals that from time to time throughout the course of this relationship, Vantage exceeded its credit limit with Ashland, although it generally paid its bills when due. By December, 1981, however, Vantage had far exceeded its $250,000 credit limit with Ashland and was not paying its bills in a timely fashion. On January 8, 1982, Randall Eli, Ashland's New York representative, notified Stephen Magnani, an assistant vice-president of Vantage, that Vantage's account was being suspended pending resolution of the credit problem. Vantage's access to Ashland oil was then terminated at all Ashland facilities except for one in Linden, New Jersey. Because the Linden facility was controlled by a computerized key-entry system that made it difficult to reinstate suspended customers quickly, Eli merely elicited a "gentlemen's agreement" from Magnani that Vantage would take no fuel from Linden without Ashland's express approval.

Despite the gentlemen's agreement, four or five loads of gasoline worth about $30,000 were taken from the Linden facility between January 8 and January 14. On January 14, Iorizzo, who knew of the "gentlemen's agreement", instructed Magnani to tell Eli that these withdrawals were accidental and that the gasoline would be transferred to another customer authorized to make credit purchases at Linden. Magnani did so in a telephone call that formed a basis of the wire fraud charged in Count 14. The transfer to the other customer was never made, and, in fact, an additional $500,000 worth of fuel was taken from the Linden facility between January 27 and February 3 in breach of the gentlemen's agreement. Nevertheless, the jury acquitted on this count.

### 1. *The Wire Fraud Conviction*

In mid-January, an Ashland credit representative contacted Vantage about certain checks mailed by Vantage but not received by Ashland. Allen Fisher, Vantage's chief financial officer, agreed to stop payment on these checks and issue replacement checks. The amount of these checks was $481,-499.29. On February 3, John Murphy, an Ashland official, sent a Western Union mailgram to Iorizzo, informing him that Ashland had received the stopped checks but not the replacements. He requested that Iorizzo cause Vantage to remit the amount by wire. The next day, Iorizzo sent the mailgram to Murphy that formed the basis of his wire fraud conviction. That mailgram stated:

> This is in reply to your mailgram of 2–3–82. We wish to advise you that we have not yet completed full analysis of the status of our account with you because of the complexity of invoices payments on account and dispersed checks as explained to you earlier. We expect to have this fully resolved in a few days but no later than February 15 at which time we shall contact you.

However, the fraudulent scheme alleged in Count 15 is the unauthorized drawing of the additional $500,000 of fuel from the Linden terminal, whereas Iorizzo's mailgram was a response to Murphy's inquiry concerning the stopped checks. The last Vantage withdrawal from the Linden terminal occurred on February 3; thus, the mailgram in question was sent after the last withdrawal.

The government argues that the purpose of the communication was to lull Ashland into a false sense of security and to induce it to refrain from taking steps to recover the fuel. *See United States v. Maze*, 414 U.S. 395, 403, 94 S.Ct. 645, 650, 38 L.Ed.2d 603 (1974); *United States v. Sampson*, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. Jones*, 712 F.2d 1316, 1320–21 (9th Cir.1983), *cert. denied*, 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983); *United States v. Angelilli*, 660 F.2d 23, 36–37 (2d Cir.1981), *cert. denied*, 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982). However, we fail to see how this equivocating response to an inquiry about a series of unpaid checks could have been found beyond a reasonable doubt to have been intended to induce a sense of security about the wholly separate incident of the unauthorized withdrawal of $500,000 worth of fuel. At best, the mailgram was designed to induce Ashland to forgo action with regard to the checks in view of a seeming confusion over multiple sets of outstanding checks. It hardly seems designed to soothe nerves over the unmentioned and wholly unexplained withdrawals of great quantities of fuel from the Linden facility. Finally, the government's claim that Ashland was able on February 4 to identify and recover the fuel taken is wholly speculative. The mailgram thus was not sent "for the purpose of executing" the fraudulent scheme charged in the indictment. *United States v. DeFiore*, 720 F.2d 757, 763 (2d Cir.1983), *cert. denied*, 466 U.S. 906, 104 S.Ct. 1684, 80 L.Ed.2d 158 (1984).

■ The government contends, in the alternative, that the mailgram was within the parameters of the January 27–February 3 scheme because of its close temporal proximity, or within the parameters of a larger scheme that began on or about November 1, when Vantage drew the gas for which the stopped checks were issued. Neither argument is persuasive. Under the temporal proximity theory, *any* mailings or wires initiated in the time period surrounding a fraudulent scheme might be deemed predicate acts for purposes of mail or wire fraud. That does not square with *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). That case involved the use of stolen credit cards for food and lodging, but the Court held that the mailing of credit slips from the stolen cards by motels for payment was an invalid basis for mail fraud. Temporal proximity is thus not enough.

The larger scheme theory is also unpersuasive because no such scheme was alleged in the indictment. Although Para-

graph 1 of the Indictment sets November 1, 1981 as the starting point of the scheme, Paragraph 2 states that the amount involved was $532,000, the sum of the January 7–14 and January 27–February 3 withdrawals from Linden. The amounts owed under the stopped checks were, therefore, not included within the fraudulent scheme charged in the indictment. Accordingly, we reverse the conviction for insufficient evidence and dismiss Count 15.

### 2. *The Interstate Transportation Conviction*

■ The interstate transportation count also involved the unauthorized withdrawal and interstate transportation of fuel from the Linden facility.

Iorizzo contends that Vantage was owed substantial sums of money by Ashland as a result of past overcharging, and, therefore, that the taking of the gas from Linden was not criminal. We note first that the jury was by no means bound to find that this version of the facts was true. Moreover, we need not pass judgment on the question of whether Vantage's conduct amounted to theft, because the legislation in question also prohibits the interstate transportation of goods taken by fraud. 18 U.S.C. § 2314. The jury could have found that directing the withdrawals from the Linden facility knowing that Ashland had not terminated Vantage's access in reliance upon the "gentlemen's agreement" was such a fraud, whether or not Iorizzo believed in good faith that Ashland owed Vantage money. Viewing the evidence in the light most favorable to the government, there was sufficient evidence for the jury to have found that Iorizzo intentionally caused the interstate transportation of stolen property.[4]

Prior to oral argument, appellant's counsel moved for a remand to the district court for additional fact-finding. The grounds for the motion were that certain documents allegedly reveal trial counsel's involvement in the preparation of the false tax returns. We believe that a remand to the district court of the conviction on Count 16 is appropriate in these circumstances. Upon remand, the court can take evidence with regard to the applicability of *United States v. Cancilla*, 725 F.2d 867 (2d Cir.1984). Since the other convictions have been reversed and remanded for a new trial or reversed and dismissed, only Count 16 is involved in this remand. This panel, if practicable, will hear any appeal after remand.

### III. CONCLUSION

The mail fraud convictions are reversed and remanded for a new trial. The wire fraud conviction is reversed and dismissed. The interstate transportation count is remanded for proceedings consistent with this opinion.

---

**4.** We reject defendant's contention that the prosecutor's mention of "uncontradicted" or "unrefuted" evidence amounted to improper commentary by the prosecutor on defendant's failure to testify. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Under the law of this circuit, such statements do not violate the *Griffin* "no-comment" rule. *See United States v. Damsky*, 740 F.2d 134, 140–41, (2d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984); *United States v. Rodriguez*, 556 F.2d 638, 641–42 (2d Cir.1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1233, 55 L.Ed.2d 762 (1978).