**UNITED STATES of America,**

v.

**John A. GOTTI, et al., Defendants.**

**No. 98 Cr. 42(BDP).**

United States District Court,
S.D. New York.

June 15, 1998.

Carol Sipperly, Marjorie Miller, Asst. U.S. Attys., Vincent Heintz, Special Asst. U.S. Atty., White Plains, NY, for U.S.A.

Gerald Shargell, Sarita Kedia, Bruce Cutler, Marc Fernich, New York City, for John A. Gotti, Jr.

James DiPietro, Brooklyn, NY, for John D'Amico.

James Kousouros, Kew Gardens, NY, for Louis Ricco.

Allan Laurence Brenner, New York City, for Mario Antonicelli.

Robert L. Ellis, New York, for Gregory DePalma.

John W. Mitchell, LaRossa, Mitchell & Ross, New York City, for Craig DePalma.

Murray Richman, Kaminsky & Rich, White Plains, NY, for Michael Sergio, Leonard Minuto, Sr.

Ronald L. Kuby, New York City, for Stephen Sergio.

William Aronwald, Aronwald & Pykett, White Plains, NY, for William Marshall.

Barry M. Fallick, Rochman Platzer Fallick & Sternheim, for Dominick Loiacono.

Paul Rinaldo, Grossman Lavine & Rinaldo, Forest Hills, NY, for Robert Sanseverino.

Joseph DeGuardia, Bronx, NY, for Steven Fortunato.

Richard A. Rhebock, Jericho, NY, for Vincent Zollo.

Andrew Weinstein, New York City, for Peter Forchetti.

Bruce P. Bendish, Goodrich & Bendish, White Plains, NY, for John Forcelli.

Stephen Lewis, White Plains, NY, for Christian Binnie.

Thomas DeGregorio, Bronx, NY, for Marco Barros.

Joseph Corozzo, New York City, for Anthony Plomitallo.

Barry E. Schulman, Brooklyn, NY, for Michael Zambouros.

Debra A. Karlsen, Jay Goldberg, New York City, Richard Ware Levitt, New York City, for Salvatore Locascio.

Richard Ware Levitt, New York City, for Salvatore Locascio.

Donald Manno, Cherry Hill, NJ, for Angelo Prisco.

J. Edward Meyer, Meyer & Wild, New York City, for John Sialiano.

Dominick Porco, Scarsdale, NY, for Dennis McClain.

## OPINION AND ORDER

PARKER, District Judge.

## INTRODUCTION

The government has moved to disqualify four defense counsel: Bruce Cutler from the trial representation of John A. Gotti, Robert L. Ellis from the representation of Gregory DePalma, Joseph R. Corozzo, Jr. from the representation of Anthony Plomitallo, and Richard A. Rehbock from the representation of Vincent Zollo.

Alleging the existence of conflicts that cannot be waived or remedied except by disqualification, the government seeks to disqualify Rehbock and Cutler primarily on the ground that they, at some point, have allegedly acted as "house counsel" for the Gambino Crime Family. The disqualification of Corozzo is sought as a consequence of his prior representation of another defendant, Vincent Zollo, and his public association with other defendants and alleged Gambino Crime Family members. Finally, the disqualification of Ellis is sought on the basis of his prior representation of William Marshall, a co-defendant and now a cooperating witness, and his involvement in matters that will be the subject of the government's proof at trial. For the reasons that follow, the government's motion is granted with respect to Rehbock and Ellis and otherwise denied.

*The Indictment*

The defendants are charged in an original and four superseding indictments (collectively, "the Indictment") with the commission of various federal crimes. Gotti, DePalma, and Zollo are charged in an 86 count superseding indictment, and Plomitallo is charged in the 60 count original indictment, with violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). 18 U.S.C. § 1961 *et seq.* The Indictment alleges that the de-

fendants, as participants in a criminal enterprise known as the Gambino Crime Family, engaged in, among other things, extortion, illegal gambling, loansharking, money laundering, robbery, and drug trafficking.

Count One of the Superseding Indictment charges Gotti, DePalma, and Zollo, along with other defendants, with engaging in a racketeering conspiracy and details 44 racketeering acts. Counts Two and Three charge Gotti and DePalma, among others, with substantive racketeering violations and with conspiracy to engage in collection of unlawful debt, respectively. Counts Four through Twelve charge Gotti and DePalma, along with other defendants, with various crimes related to the extortionate control by the Gambino Crime Family of the nightclub "Scores." The Superseding Indictment also includes, among other charges, 6 counts of money laundering and 48 loan sharking counts.

## DISCUSSION

■ A criminal defendant has a right under the Sixth Amendment "to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. At the same time, courts are obligated to protect the integrity of judicial proceedings and to ensure the effectiveness of the assistance of counsel by eliminating actual conflicts and carefully regulating potential ones. *Wheat v. United States*, 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

■ Although the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, its essential aim is to guarantee a criminal defendant an effective advocate rather than to ensure that a defendant will inexorably be represented by preferred counsel. *Wheat*, 486 U.S. at 159, 108 S.Ct. 1692. Thus, the Sixth Amendment "recognizes a presumption in favor of the accused's chosen counsel" that may be overcome by circumstances that weigh in favor of disqualification. *United States v. Locascio*, 6 F.3d 924, 931 (2d Cir. 1993) (citations omitted). However, disqualification is a harsh remedy that should be invoked infrequently since it raises problems of constitutional dimensions. *Id.* at 935;

*United States v. Gambino*, 838 F.Supp. 749, 753 (S.D.N.Y.1993).

■ The decision whether to disqualify requires balancing the constitutional right to counsel against the importance of "ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160, 108 S.Ct. 1692; *Locascio*, 6 F.3d at 935. Consequently, "in evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.'" *Wheat*, 486 U.S. at 160, 108 S.Ct. 1692 (quoting *United States v. Cronic*, 466 U.S. 648, 657, n. 21, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)).

■ With these threshold principles in mind, we turn to the government's contentions. The government has advanced multiple grounds for the disqualification of each attorney, grounds that may raise two types of problems. First, a defense attorney who is implicated in events that may become the subject of the government's proof becomes an unsworn witness at trial and, as a consequence, is not an appropriate advocate. *See Locascio*, 6 F.3d at 933–934. Second, an attorney's prior representation of a co-defendant or a significant witness in the matter for which his client is on trial may be subject to conflicting loyalties that impair representation of the client on trial. *See Wheat*, 486 U.S. at 155–156, 108 S.Ct. 1692. The possibility that an attorney has acted as house counsel for a RICO enterprise typically raises both types of problems. When there are multiple potential bases for disqualification, the decision turns on a consideration of the various grounds in the aggregate. *United States v. Rahman*, 861 F.Supp. 266, 274 (S.D.N.Y.1994) (citing *United States v. Levy*, 25 F.3d 146, 157 (2d Cir.1994)).

### *Attorney's Prior Representation*

■ An attorney may be disqualified due to his "prior representation of a witness or co-defendant" in his present client's case. *Locascio*, 6 F.3d at 931 (citing *U.S. ex rel. Stewart v. Kelly*, 870 F.2d 854, 856–857 (2d

Cir.1989)). The concern here is that the attorney-client relationship with the witness or co-defendant gave rise to continuing obligations of loyalty and confidentiality that may be breached when the confidences are required to be exploited in, for example, cross examining the former client. On the other hand, if prior confidences are respected, the representation of the new client might be ineffective due, for example, to the inability of counsel to conduct a thorough cross-examination. *United States v. Iorizzo,* 786 F.2d 52, 57 (2d Cir.1986). A waiver by both clients typically alleviates this problem. *United States v. Leslie,* 103 F.3d 1093, 1098 (2d Cir.1997); *United States v. Lussier,* 71 F.3d 456, 462 (2d Cir.1995) (citations omitted); *Iorizzo,* 786 F.2d at 57–58. A waiver by the current client alone will obviate the need for disqualification, unless the "conflict is so egregious that no rational defendant would knowingly and voluntarily desire the attorney's representation." *See Lussier,* 71 F.3d at 461. *See United States v. Levy,* 25 F.3d 146, 153 (2d Cir.1994).

*Attorney Involvement*

■ An attorney may be disqualified if he has first-hand knowledge of events that may be part of the government's proof at trial. In such circumstances, the attorney, if allowed to participate, could become an "unsworn witness for the accused" and the attorney's ability to rely, even if tacitly or indirectly, on his own knowledge of the events in question may provide "his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross-examination." *Locascio,* 6 F.3d at 931 (citing *United States v. McKeon,* 738 F.2d 26, 34–35 (2d Cir.1984)); *United States v. Cunningham,* 672 F.2d 1064, 1075 (2d Cir.1982).

■ Alternatively, the attorney's desire to minimize his own involvement in the events in question or to characterize his own conduct favorably creates pressures potentially inimical to his client's interests. *Locascio,* 6 F.3d at 933; *United States v. Arrington,* 867 F.2d 122, 129 (2d Cir.1989). Because the attorney's status as an unsworn witness may

inure to the benefit of the defendant, "[w]aiver by the defendant is ineffective in curing the impropriety in such situations, since he is not the party prejudiced ." *Locascio,* 6 F.3d at 934 (citing *Cunningham,* 672 F.2d at 1074–1075).

■ As previously noted, an attorney's purported role as house counsel frequently raises both the prior representation and unsworn witness problems. *Locascio,* 6 F.3d at 933. An attorney's status as house counsel may be used to prove the existence of the enterprise, as required by RICO. An attorney's role as house counsel may also pit counsel's duties to his individual client against his overall loyalty to the organization. *Id.* Either of these problems implicates both the effectiveness of the representation of a particular client and the overall fairness and integrity of the trial process.

*The Government's Grounds for Disqualification*

Motions to disqualify typically present complicated practical problems. The potential for a serious conflict must, of course, be assessed by the trial court prospectively, without the benefit of testimony or a full record. *Wheat,* 486 U.S at 163, 108 S.Ct. 1692. The predicate for decisions regarding disqualification is often supplied by government proffer at a time when the government's proof is largely unknown to defendants or to the Court and consequently cannot, in any realistic way, be challenged or tested. In other words, disqualification motions often "require considerable conjecture by courts." *Gambino,* 838 F.Supp. at 753. "The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials." *United States v. Gotti,* 771 F.Supp. 552, 558 (E.D.N.Y.1991) (quoting *Wheat,* 486 U.S. at 162–163, 108 S.Ct. 1692) (internal quotations omitted).

Bearing in mind these practical problems, we now consider the Government's showing with respect to each attorney.

*Joseph Corozzo, Jr.*

██ The government seeks to disqualify Joseph Corozzo, Jr. from representing Anthony Plomitallo due to Corozzo's prior representation of Vincent Zollo, a co-defendant in this case, and Corozzo's presence with certain defendants and other alleged members of the Gambino Crime Family at the Foxwoods Casino in April 1994 where, among other things, according to the government, Family business was discussed.

The government's evidence of the Foxwoods gathering consists of certain surveillance video tapes (without audio) of casino common areas taken over the course of two days. Corozzo appears at various times in the video. At oral argument the government stated that it intended to introduce trial testimony that the gathering constituted evidence of the existence of the enterprise charged in the Indictment. Although the government has not indicated that it will argue at trial that Corozzo functioned as house counsel, the government does contend that Corozzo was directed by John A. Gotti ("Gotti") to represent other members of the Family. Further, the government plans to use the association between Gotti and Corozzo to link Plomitallo to Gotti. Finally, the government contends that Corozzo's active participation in the Foxwoods meeting would make him an unsworn witness.

The government has not persuaded the Court that Corozzo's appearance in the Foxwoods video is sufficient to warrant his disqualification or risk impairment of Plomitallo's right to effective representation. There is nothing especially unusual about the presence of an attorney at a casino or in the presence of clients or potential clients. The evidentiary significance of the Foxwoods video as probative of the existence of the Gambino Crime Family enterprise has not been shown to be dependent on Corozzo's identification in the video. Similarly, it is not clear why testimony regarding the purpose of the Foxwoods gathering must specifically refer to Corozzo as a participant. In the absence of any allegation that Corozzo did more than appear at Foxwoods in the company of defendants, what the government describes as Co-rozzo's "close association" with John A. Gotti does not warrant Corozzo's disqualification.

██ The government also seeks Corozzo's disqualification on the basis of his prior representation of Vincent Zollo, which began in the Fall of 1994. Corozzo represented Zollo in connection with a grand jury investigation in the Eastern District of New York into the relationship between Zollo Construction Co. and John A. Gotti, an investigation with respect to which Gotti and Zollo, according to the government, conferred over strategy.

As previously noted, an attorney's prior representation of his current client's co-defendant creates a potential for conflict because the interests of the current and former client may diverge. *See Wheat,* 486 U.S. at 163–164, 108 S.Ct. 1692. In this case, however, the possibility of a conflict sufficient to warrant disqualification has been blunted by the fact that defendant Zollo has indicated his willingness to waive the attorney-client privilege in connection with Corozzo's prior representation of him, and Plomitallo has apparently indicated that he, too, will waive this potential conflict. *See Leslie,* 103 F.3d at 1098. We see no reason why these waivers do not adequately address the issues raised by Corozzo's prior representation of Zollo. For these reasons, the government's motion to disqualify Joseph Corozzo, Jr. is denied.

*Robert Ellis*

██ The government moves to disqualify Robert L. Ellis from representing Gregory DePalma on two grounds: Ellis' previous representation of William Marshall and Ellis' alleged involvement in matters that will be the subject of the government's proof at trial. Marshall, a defendant, has pled guilty. He is expected to be a key government witness at trial and to testify against Ellis' current client, Gregory DePalma. Marshall, according to the government, is expected to testify about criminal activities he engaged in with DePalma, including loansharking, extortion, and illegal gambling. Marshall will also testify that DePalma stated that he (DePalma) told Ellis to "keep an eye on the business" of Ted Hall, an alleged loanshark debtor.

Between 1992 and 1996, Ellis had three professional contacts with Marshall, contacts that the government and Ellis characterize differently. First, from 1992 to 1994, Ellis defended Marshall in state court against charges that he extorted the owner of the nightclub "Colours" in Elmsford, New York. *People v. Marshall,* Indictment No. 1981/92 (Sup.Ct. Westchester County). After a jury trial at which Marshall testified, he was acquitted. This is the only one of the three contacts that the government and Ellis both agree give rise to an attorney-client relationship between Marshall and Ellis.

Second, the government contends that in 1996 Ellis represented Marshall regarding possible questioning by the police arising from the fact that Marshall apparently witnessed two murders at the Scores nightclub in Manhattan, an event of considerable significance to various counts of the Indictment in this case.[1] Specifically, the government asserts that Ellis actively inquired as to whether Marshall was a target of the investigation of the Scores incident. Further, according to the government, Ellis represented that Marshall would assert his Fifth Amendment rights in response to any questions about the murders.

Ellis offers a different description of his involvement with Marshall in these events. Ellis contends that, in fact, he did not represent Marshall in the Scores investigation, and that his involvement related almost exclusively to advice to Marshall's then girlfriend (and now wife) Lori Zennario. According to Ellis, Marshall requested that Ellis represent Zennario concerning her grand jury testimony about the Scores murders. Ellis subsequently represented Zennario in four interviews by authorities and two grand jury appearances. Ellis states that he had minimal contact with Marshall, and did not meet with Marshall other than in Zennario's presence. Ellis contends that he did not act on Marshall's behalf and expressed Marshall's unwillingness to be interviewed only in response to an inquiry by the government. Although Ellis acknowledges that he did have some discussion with

Marshall about the Scores murders, that discussion was, according to Ellis, "general and undetailed" and was not memorialized in any fashion.

Ellis' third professional contact with Marshall came in September 1996 after the execution of search warrants at Marshall's residence and the seizure of certain items of Marshall's property. Both the government and Ellis agree that after a conversation about how to retrieve Marshall's property and about the investigation pursuant to which the search was conducted, Ellis informed Marshall that Ellis' representation of Gregory DePalma precluded his representation of Marshall. Notwithstanding Ellis' statement that he could not represent Marshall, the government contends that Ellis inquired of the authorities as to the purpose and focus of the investigation. Ellis has no recollection of any such inquiry and emphasizes that his single meeting with Marshall in connection with the search lasted only ten to fifteen minutes and the discussion pertained solely to the possibility of recovering Marshall's property and the nature of the investigation.

After Marshall was indicted in this case, incarcerated, and represented by other counsel, Ellis, without the consent of Marshall's new counsel, visited Marshall to discuss his relationship with DePalma and apparently to explore rumors that Marshall was cooperating with the government. The government points to this contact as indicative of Ellis' propensity to exploit unfairly his former relationship with Marshall.

The problems arising from Ellis' prior representation of Marshall are significant ones: Marshall, a former client, avers that he imparted confidential information to Ellis, refuses to waive his attorney-client privilege, opposes Ellis' continuation in this case, is cooperating with the government and is expected to be a major government witness at trial whose testimony is expected directly to implicate Ellis' current client.

Ellis believes that each of these problems can be addressed satisfactorily. Ellis, main-

---

1. The government contends that the murder conspiracy charged in the Indictment was in retalia-

tion for the Scores murders that Marshall allegedly witnessed.

taining that he received no privileged information from Marshall, offers to agree to forego cross-examination of Marshall with respect to any matters within the scope of their prior professional relationship. Because he genuinely believes that Marshall was in fact innocent of extortion, Ellis asserts that no purpose would be served by cross-examination about Marshall's testimony in the extortion trial or about the underlying facts of that case. Ellis further believes that neither the Scores representation nor his discussion with Marshall about the search of his home and seizure of his property would plausibly provide a reasonable subject of cross-examination. DePalma accedes to this proposal and has agreed to waive his right to conflict-free counsel. Marshall, as noted, does not. Although waivers may be permitted for certain non-severe potential conflicts, see *United States v. Levy*, 25 F.3d 146, 155 (2d Cir.1994) and *United States v. Curcio*, 680 F.2d 881 (2d Cir.1982), a waiver by DePalma does not solve the problem, particularly since Marshall refuses to waive his attorney-client privilege.

Here, too many factors point to serious conflicts and the risk is simply too great that Ellis' prior representation of Marshall irreconcilably conflicts with his current representation of DePalma. If, as expected, Marshall, as a major government witness, directly implicates DePalma in criminal conduct, any prior agreements to limit cross-examination would call directly into question the effectiveness of Ellis' representation of DePalma and would raise more questions than they would solve. Aggressive cross-examination of Marshall, on the other hand, could compromise Marshall's privilege as well as Ellis' continuing obligations to him.

Ellis' alleged involvement in the extortion of Ted Hall, to which Marshall is expected to testify, also raises problems. According to the government's proffer, Marshall will testify that DePalma asked Ellis to "keep an eye on" Hall's business, which, in effect, was security for an unlawful loan made by DePalma as part of his loansharking business. Marshall's anticipated testimony thus implicates Ellis in conduct that will be the subject of the government's proof at trial, making him an unsworn witness.

Ellis denies that DePalma made any such request and avers that any such testimony would be groundless. However, the Court is simply not free to discount Marshall's likely testimony. Allegations by a government witness that connect defense counsel to conduct that is the subject of the indictment must be treated as credible for purposes of a motion to disqualify. *United States v. Fulton*, 5 F.3d 605, 612–613 (2d Cir.1993).

In view of the nature and significance of the conflicts the government has documented, its motion to disqualify Robert Ellis from the representation of Gregory DePalma is granted.

*Richard Rehbock*

The government asserts numerous bases for the disqualification of Richard Rehbock from the representation of Vincent Zollo. It contends that Rehbock has acted as house counsel for the Gambino Crime Family, that he is otherwise involved in events that will comprise the government's proof at trial, and that several of Rehbock's former clients may testify as government witnesses. Finally, Rehbock faces a possible suspension from the practice of law as a result of his guilty plea to felony tax evasion charges.

Significantly, the government plans to offer evidence that Rehbock has acted as "house counsel" during the investigation that resulted in the Indictment in this case and during events surrounding the return of the original indictment. This evidence, according to the government, directly implicates Rehbock in conduct relevant to proving the existence of the alleged RICO enterprise and other charges in the Indictment.

The government contends that during its investigation Rehbock represented at least nine individuals purportedly affiliated with the Gambino Crime Family, including the defendants John A. Gotti, Anthony Plomitallo, and Vincent Zollo, Rehbock's current client. Rehbock also represented seven individuals in connection with their testimony before the Organized Crime Task Force ("OCTF"). These witnesses were questioned

at length about various matters that, according to the government, will be the subject of proof at trial.

The government proffers that it intends to offer evidence that Rehbock was directed to represent subordinate members of the Gambino Crime Family at the behest of John A. Gotti. Specifically, the government will offer tape recorded statements by Zollo and two other individuals to show that in 1996 Zollo retained Rehbock and dismissed another attorney at the direction of Gambino Crime Family members, notwithstanding Zollo's reservations about Rehbock. The government will also offer evidence that Gotti directed Anthony Amoroso, another alleged member of the Gambino Crime Family, to retain Rehbock in connection with the 1996–1997 investigation by the OCTF. The government will offer a tape of a statement by Gregory DePalma that Gotti offered to hire Rehbock to represent his son, Craig DePalma, in a 1995 matter. In view of these multiple, conflicting representations, the government argues with some force that here, as in *Locascio*, Rehbock's "status as house counsel is potentially part of the proof of the Gambino criminal enterprise." *Locascio*, 6 F.3d at 933.

In addition to his purported house counsel role, the government contends that Rehbock should be disqualified because several of his former clients are defendants or may be called as witnesses at trial. For example, Rehbock represented defendant Anthony Plomitallo during the investigation of this case from October 1997 through the filing of the original indictment and was involved in numerous conferences and correspondence on Plomitallo's behalf.

Rehbock represented Gotti before the OCTF and in other matters relating to this case. Specifically, Rehbock identified $358,000 in cash and a firearm seized at 106–13 101st Avenue, Queens, New York, as property of Gotti. Rehbock also represented Gotti in connection with his attempts to reclaim other property seized from that location, at his arraignment, his initial pre-trial conference and the early phases of his detention hearing. In addition, one of Rehbock's former clients, Walter Panek, will offer testimo-

ny directly adverse to Rehbock's current client, Vincent Zollo.

Efforts to cross examine former clients called as witnesses at trial will present Rehbock with a nearly impossible ethical dilemma. These witnesses, according to the government, will offer testimony that, by demonstrating the relationship between Gotti, Zollo and Zollo Construction, may be directly adverse to the interests of Rehbock's current client, Zollo. On the one hand, Rehbock owes a duty to Zollo to cross-examine these witnesses as vigorously as possible. On the other hand, Rehbock clearly may not use privileged information which he obtained through his representation of these former clients for that purpose. *See, e.g., Rogers,* 9 F.3d 1025, 1031–32; *Iorizzo,* 786 F.2d at 57–58. Rehbock owes continuing duties of loyalty to those he represented at the OCTF hearings which preclude him, for example, from attempting to characterize or exploit their prior testimony for Zollo's benefit.

The law is clear that "counsel's prior representation of a witness or co-defendant" is one of the "typical" situations in which a District Court can properly find that disqualification is necessary. *Locascio,* 6 F.3d at 931, (citing *Stewart,* 870 F.2d at 856–57). Wholesale waivers are not appropriate to address these concerns in light of this Court's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession." *Id.* (quoting *Wheat,* 486 U.S. at 160, 108 S.Ct. 1692).

Wholly apart from Rehbock's prior representation of the parties and numerous potential witnesses is the fact that Rehbock may well be a witness to crucial facts likely to be the subject of proof at trial. According to the government, the evidence at trial will show that on September 10, 1996, Rehbock participated in a meeting with defendants John A. Gotti, Anthony Plomitallo, business associate Michael DiGeorgio, and others about their prepaid telephone calling card business which is a subject of the Indictment. This meeting took place at the offices of Nicodan Telecommunications, in Queens, New York, and was intercepted and recorded

by the government via a court-authorized eavesdropping device. In that meeting, Rehbock, according to the government, gave the defendants advice on how to structure their business in order to make it judgment-proof and how to improperly insulate it from creditors. Regardless of Rehbock's knowledge of defendants' allegedly fraudulent scheme, his participation in this conversation would make him an unsworn witness at trial.

These problems, considered in the aggregate, render Rehbock ill-suited to serve as trial counsel in this case. His alleged status as house counsel directly implicates him in the government's proof and makes it unseemly for him to contest at the same time the government's allegations against Zollo. Rehbock's participation in the taped conversation relating to structuring the credit card business casts him as an unsworn witness with respect to, and potentially implicates him in, crimes charged in the Indictment. The ethical difficulties posed by these problems, which are compounded by Rehbock's previous representation of other defendants and government witnesses, leave the Court no choice but to disqualify Rehbock from representing Zollo.

*Bruce Cutler*

■ The government moves to disqualify Bruce Cutler from the trial representation of John A. Gotti primarily on the ground that Cutler has functioned as house counsel for the Gambino Crime Family. The government's motion rests largely on five tapes of conversations intercepted at the Ravenite Social Club in Manhattan in 1990. Cutler was captured on certain of these tapes and they were a portion of the evidence that justified Cutlet's disqualification in an earlier case in the Eastern District of New York involving John J. Gotti, the current defendant's father. *See United States v. Gotti,* 771 F.Supp. 552 (E.D.N.Y.1991) ("*Gotti I*") *aff'd sub nom. Locascio,* 6 F.3d 924. Thereafter, in 1993 the government unsuccessfully sought to have Cutler disqualified from the representation of Joseph Gambino at his retrial.[2] *See*

*United States v. Gambino,* 838 F.Supp. 749 (S.D.N.Y.1993).

Although the same enterprise is alleged here as in *Gotti I,* which was tried nearly seven years ago, the two cases involve entirely different defendants. The 1990 tapes primarily captured the statements of Gotti, Sr., Frank Locascio, and Salvatore Gravano, all of whom were defendants in the 1992 Eastern District trial but are not defendants here. None of the defendants in this case are alleged to be participants in any conversations on the Ravenite tapes.

On one tape, dated January 4, 1990, Gotti, St. complains about his lawyers, especially their high fees. On two of the tapes, in conversations dated February 27, 1990 and March 9, 1990, Gotti, Sr. expresses to Cutler his insistence that no potential defendants make admissions regarding the existence of the mafia. On the fourth tape, dated April 18, 1990, Cutler tells Gotti, Sr. that other lawyers are unwilling to dispute the existence of the mafia, but that he (Cutler) will. Gotti, Sr. responds "that's the way I want it." In the fifth tape, dated March 29, 1990, Gotti, Sr. and Cutler discuss the possibility of a subpoenaed associate, Anthony Rampino, refusing to give grand jury testimony.

The significance of the 1990 Ravenite tapes in *Gotti I* in 1991 does not fix their significance in this case. In light of the passage of time, the changed identity of the defendants, and the disparate substantive crimes charged, the government has not demonstrated that the Ravenite tapes weigh nearly as heavily against Cutler's participation in this case as in the earlier trial.

Moreover, the subjects of several of the taped conversations relate directly to the crimes charged in *Gotti I,* but not to crimes charged in this case. For example, the Court concluded that the 1990 Rampino tape constituted probative evidence of an obstruction of justice charge. *See Gotti I,* 771 F.Supp. at 558, 565. In this case, in contrast, the Rampino tape, while claimed to be probative in 1990 of the existence of the alleged racketeering enterprise, will apparently not

---

**2.** Cutler served as Gambino's counsel during the initial trial without incident. *See United States v.*

*Gambino,* 838 F.Supp. 749, 751 (S.D.N.Y.1993).

be offered to prove any substantive crime charged in the Indictment. The Indictment here charges substantive offenses allegedly occurring from the mid–1990's to the present.

In *Gotti I,* the evidence that Cutler functioned as house counsel consisted not only of the Ravenite tapes, but witness testimony as well. An important government witness was Michael Coiro, a former member of the Gambino Crime Family. The government proffered that Coiro would testify that Cutler had defended him against criminal charges in *United States v. Ruggiero,* 83 CR. 412 (E.D.N.Y.), at the direction of Gotti, Sr., and that Cutler was compensated not by Coiro, but by Gotti, Sr. *See Gotti I,* 771 F.Supp. at 556–557. Similarly, the government offered extensive witness testimony that Gotti, Sr. selected counsel, including Cutler, for other members of the Gambino Crime Family.

In *Gotti I* the government also contended that Cutler's prior representation of Coiro presented an actual conflict and that Coiro's trial testimony would not only be damaging to Cutlet's client, but potentially to Cutler as well. Thus, not only was Cutler captured on tape, he was also caught between his loyalty to a former client and his duty to a current client whose interests were arguably adverse to his own. *See Fulton,* 5 F.3d at 610 (witness testimony adverse to defense attorney creates an actual conflict) (citations omitted).

In addition to the Ravenite tapes, the government in this case offers one tape each from 1995 and 1997. The 1995 tape contains Gregory DePalma's statement that John A. Gotti offered to hire either Bruce Cutler or Richard Rehbock to represent DePalma's son in a pending criminal matter. The 1997 tape contains a conversation between John J. and John A. Gotti, during the son's visit to his father in prison. John J. Gotti told his son:

> You make your Uncle Pete tell Bruce, when you tell my brother that you don't want to be a campaign manager running a fucking publicity campaign.... We're not looking for no fucking false publicity. We're lookin' for the truth to combat this thing.

Why the government feels this tape is highly probative on the house counsel issue is not clear. Gotti, Sr. tell's is son on the tape to relay information to Gotti, Sr.'s lawyer, Bruce Cutler, and apparently little else. Contrary to the government's contention, the 1997 tape does not necessarily compel an inference that Cutler continued to act as house counsel. While Gotti, Sr.'s statements might plausibly support other interpretations, on their face the statements neither indicate that Cutler was house counsel. as of the date of the conversation, that Gotti, Sr. sought to retain Cutler to represent some other alleged member of the Family, nor that Cutler was otherwise involved in matters likely to be the subject of the government's proof at trial.

Neither the Ravenite tapes nor the later ones provide a sufficient basis for disqualification. The government's bare-bones assertion that the evidence that Cutler served as house counsel in 1990 is equally potent today has not been adequately supported: the government's presumption that proof that Cutler was house counsel in 1990 is strong proof he continues in that role is far from self-evident. The government has also not satisfactorily set forth the relationship between these tapes and the 7,000 others involved in this case or the 300–400 it now believes it will play at trial. Proof that is both old and apparently peripheral should seldom be dispositive on questions of disqualification.

The government's ground for seeking to disqualify Cutler on the basis of his status as house counsel sharply contrasts with the showing that justified Rehbock's disqualification. Rehbock, as we have seen, during the investigation and when the Indictment was returned, represented defendants and numerous witnesses whose significant participation at trial appears unavoidable. In contrast, the allegations concerning Cutler are years old, largely unrelated to the current Indictment, and predate an unsuccessful government motion to disqualify him in 1993.

Cutler suggests, but the government opposes, redactions of the tapes. Given the brevity of the tapes and the uncertainty of their significance, it is not clear that redaction would unfairly disadvantage or prejudice the government by eviscerating its case, nor impair the integrity of the trial. *Cf. Gotti I,* 771 F.Supp. at 566 (concluding that the "ex-

tensive redactions which the defendants propose would not only emasculate the intercepted conversations but would deprive the government of its right to present its case as it deems best as well as deprive it of the right to present evidence which is relevant and admissible."). Even if redacted, the tapes could continue to serve the evidentiary purpose for which the government seeks to use them, namely proof of the existence of the enterprise charged in the Indictment.

In sum, in contrast to *Gotti I* where the Court concluded that the government's evidence was sufficiently potent that it "may leave the jury with little doubt" that Cutler operated as house counsel, *Gotti I*, 771 F.Supp. at 560, no similar showing has been made here. The Court is not persuaded that the government has demonstrated sufficient reasons to disqualify Cutler.

### CONCLUSION

For the reasons stated, the government's motion to disqualify Richard A. Rehbock and Robert L. Ellis is granted. The government's motion to disqualify Joseph R. Corozzo and Bruce Cutler is denied. Defendants Gregory DePalma and Vincent Zollo are directed to retain new counsel within 14 days. The parties are directed to appear for a pretrial conference on July 1, 1998 at 9:15 a.m.

**SO ORDERED.**